1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3

   BRUCE WHITE, *on behalf of*        Case No. 1:11-cv-2615
4  *himself and all others*          Cleveland, Ohio
   *similarly situated*,
5
              Plaintiff,
6
        vs.                          FRIDAY, FEBRUARY 22, 2013
7
   CRST, INC.,
8
              Defendants.
9

10

         TRANSCRIPT OF CLASS ACTION SETTLEMENT PROCEEDINGS
11            BEFORE THE HONORABLE JAMES S. GWIN
              UNITED STATES DISTRICT JUDGE
12

13

14

15

16 Official Court Reporter:   Sarah E. Nageotte, RDR, CRR, CBC
                              United States District Court
17                            801 West Superior Avenue
                              Court Reporters 7-189
18                            Cleveland, Ohio 44113
                              (216) 357-7186
19

20

21

22

23

24

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.

1

2    **APPEARANCES:**

3    For Plaintiff:              DENNIS M. O'TOOLE, Esquire
                                 ANTHONY R. PECORA, Esquire
4                                MATTHEW A. DOOLEY, Esquire
                                 *Stumphauzer O'Toole*
5                                *5455 Detroit Road*
                                 *Sheffield Village, Ohio 44054*
6
                     By phone   LEONARD A. BENNETT, Esquire
7                                *Consumer Litigation Associates*
                                 *763 J. Clyde Morris Boulevard*
8                                *Suite 1-A*
                                 *Newport News, Virginia 23601*
9

10   For Defendant:             GREGORY J. LUCHT, Esquire
                                 DAVID M. KRUEGER, Esquire
11                               *Benesch, Friedlander,*
                                 *Coplan & Aronoff*
12                               *200 Public Square*
                                 *2300 BP Tower*
13                               *Cleveland, Ohio 44114*

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 10:38 a.m.)

 2                           -  -  -

 3              THE COURT:  We're here on 11-cv-2615, White

 4    versus CRST, Incorporated.

 5         The case is here today for a hearing as to whether a

 6    proposed settlement should be accepted by the Court.

 7         The Court has received certain objections, and I'm not

 8    sure if anybody here -- let me just ask if anybody's here

 9    that is objecting to the -- to the proposed settlement?

10                           (No response)

11              THE COURT:  On behalf of the plaintiff, do you

12    want to make any opening statement?

13              MR. O'TOOLE:  Yes, Your Honor.

14         Dennis O'Toole.  Also here is Matt Dooley and Anthony

15    Pecora.

16         Your Honor, for the convenience of the Court, we have

17    prepared a booklet which kind of summarizes those pleadings

18    and matters of status for the Court's consideration.

19         We, of course, are prepared to discuss any and all

20    aspects of that and I would be pleased to do so either now

21    or later.

22         I would point out to the Court, first, under the first

23    tab is a list of 20 objectors -- I'm sorry -- persons who

24    have opted out of the class.

25         Under the second tab, Judge, is the joint motion for
```

10:38:12 (line 5)
10:38:37 (line 10)
10:38:52 (line 15)
10:39:10 (line 20)
10:39:28 (line 25)

1   final approval, submitted both on behalf of the plaintiff,

2   as well as the defendant.

3        And on the third page of that motion, Judge, is a

4   table of contents which show I think all of the requisite

10:39:53  5   sections and issues that would lead this Court to conclude

6   that the settlement is fair and should be approved.

7        Under Tab A --

8             THE COURT:  So remind me of the overall

9   statutory scheme of the CRST.

10:40:11 10        If there's a violation -- and in this case, the

11   allegation is the class members, what, had adverse

12   employment action and did not receive notice that some

13   credit report had been at least a factor in --

14             MR. O'TOOLE:  Yes, Judge.

10:40:33 15             THE COURT:  And so, how many were actually in

16   the class that --

17             MR. O'TOOLE:  163,194.

18        And, Judge, I was remiss in saying that Len Bennett,

19   also co-lead counsel, is also appearing by call.  I forgot

10:40:51 20   to mention that to the Court.

21             THE COURT:  Okay.  So roughly 170,000 people

22   had been turned down for employment at least in part because

23   of a credit report?

24             MR. O'TOOLE:  16 -- 163,000 failed to receive

10:41:08 25   the proper pre-adverse and post-adverse notices, Your Honor,

1    and pretty much detailed on page four --

2              THE COURT:  How many of those would have been

3    pre-employment and how many would have been post?

4              MR. O'TOOLE:  We have two classes, Judge.

10:41:27  5    We have a two-year class and a five -- five-year

6    class, all of them would fall under the -- the violation

7    which occurred.

8              THE COURT:  So the -- you make an allegation

9    that the violation was willful?

10:41:41  10              MR. O'TOOLE:  Yes, Your Honor.

11              THE COURT:  For a willful violation, what

12    damages would have otherwise been recoverable?

13              MR. BENNETT:  Your Honor, not to disrupt, and

14    I appreciate the courtesy of appearing by phone, this is

10:41:59  15    Leonard Bennett.  And I'm sorry I'm not there in person.

16         If I may be heard on this issue?

17              THE COURT:  Go ahead.

18              MR. BENNETT:  Judge, assuming that we could

19    establish willfulness, then the recovery would have been

10:42:17  20    statutory damages between 100 and $1,000.

21         The courts have not uniformly interpreted or defined

22    the factors that the Court could consider between the 100

23    and 1,000 range.

24         But the Fourth Circuit alone, it's neither in conflict

10:42:41  25    or consensus, it's the only circuit to have so ruled, in

1    *Stillmock versus Weis Market*, the Fourth Circuit found that

2    the amount between 100 and $1,000 would be impacted by the

3    number of violations that have occurred.

4         And in this case, class members are single violation

10:43:08 5    consumers almost across the board and it's still not

6    court-applied.  The defendant would have an argument, and I

7    would try to beat that argument, but the defendant would --

8    to use the *Stillmock* analysis -- try to push that number

9    toward the $100 of that 1,000.

10:43:29 10         Now, it is also possible that the Court could find

11   punitive damages.  Candidly, in -- I'm not aware of any of

12   the employment class action settlements, and there have been

13   I would say roughly 15 to 20, some of which I have been

14   involved in and others not, but I'm not aware of any that

10:43:50 15   have -- in which anyone has been able to negotiate punitive

16   damages, which the Court is probably going to find that

17   unremarkable.

18              THE COURT:  Well, could claimants make claim

19   for actual damages?

10:44:03 20              MR. BENNETT:  The statutory framework allows

21   statutory damages as a proxy or substitute for actuals.  You

22   wouldn't get both.

23         So that if a consumer went to trial and had actual

24   legal, proved actual damages greater than $1,000, then the

10:44:25 25   statutory damage remedy would not apply and he would be able

1    to recover your actual damages under a theory of negligence,

2    not simply willfulness.

3              THE COURT:  Okay.  I mean, how is this a fair

4    and -- settlement then?

10:44:43  5              MR. BENNETT:  Yes, Your Honor.

6         The violation that's alleged here, and I think if you

7    have read the objections, you see some of the -- the divide

8    between I think what the case alleges and what the objectors

9    might be concerned about, this is not a case pertaining to a

10:45:04 10   consumer or an employer's right to hire or fire.

11        Of course, most states, when you grow up litigating in

12   Virginia --

13             THE COURT:  Let me just -- you know, you

14   should have been here.  You knew this was coming.  This is

10:45:18 15   not working out and I don't need your kind of off-hands

16   about if I had grown up as a consumer in Virginia.

17             MR. BENNETT:  I apologize.

18             THE COURT:  The question I asked was,

19   you're -- basically, the claimants would be foreclosed from

10:45:36 20   making claim for actual damages.

21        In most of these cases, these would have been people

22   applying for trucking positions, right?

23             MR. BENNETT:  Yes, Your Honor.

24             THE COURT:  And they would have been people

10:45:48 25   that almost by implication were either out of work or found

1    a job with CRST to be more advantageous than the job they

2    were in?

3                    MR. BENNETT:  Correct, Your Honor.

4         Except that the violation that is relieved and is

10:46:07 5    prosecuted does not -- is not based on the failure to hire.

6    It is based on the timing of the access of a consumer report

7    and the failure to provide additional rights, rights to the

8    consumer.

9                    THE COURT:  Well, except for the fact that

10:46:31 10   there would be a fair percentage of these consumers who, if

11   they had gotten notice of the credit report, could have

12   corrected something.

13        It may not be a majority, but there would -- out of

14   170,000, I mean, we know from related cases that there's a

10:46:56 15   fair number of those where there's been a mistake in the

16   credit report and a person would have lost a job

17   opportunity.

18                    MR. BENNETT:  Yes, Your Honor.

19        But the -- the error in the credit report would have

10:47:13 20   been caused by a separate set of violations under the Fair

21   Credit Reporting Act, that our remedy against a consumer

22   reporting agency, there are --

23                    THE COURT:  How would the consumer know, if he

24   hasn't received notice, how would he know that the credit

10:47:35 25   report was a part of some type -- was a part of the decision

1    not to hire him?

2              MR. BENNETT:  You're correct, Your Honor, that

3    the failure to provide these consumers some of the rights

4    could cause injury for those that have an inaccuracy that

10:47:54 5    could have been corrected.

6         But there is not evidence that CRST would have refused

7    to hire post-correction, and amongst the 163,000 class

8    members, those include individuals whose privacy rights were

9    injured, and then a separate group of individuals who have

10:48:21 10   an adverse action claim.  That is, not every one of those

11   163,000 was to prosecute a claim based on the failure to

12   hire.

13             THE COURT:  So if there's been a violation,

14   the statutory payment would be at least a -- without a

10:48:47 15   showing of actual damages, the statutory would have been

16   payment of at least $100, but not more than 1,000?

17             MR. BENNETT:  Correct.

18             THE COURT:  Unless punitives have been given.

19        And you've ended up settling this case for 200, less

10:49:06 20   fees and expenses, or 125, less fees and expenses?

21             MR. BENNETT:  Yes, Your Honor.

22             THE COURT:  How is that some great deal for

23   these employees that were not given notice?

24             MR. BENNETT:  Well, Your Honor, for those

10:49:25 25   individuals who would receive the 100 or $125, it's

                    1   certainly in excess of the $100 threshold, the minimum

                    2   threshold.

                    3           THE COURT:  Barely.

                    4           MR. BENNETT:  Yes, Your Honor.

    10:49:43        5       But they do not have to win their summary judgment

                    6   motion, win the class certification motion, go to trial, and

                    7   convince a jury.

                    8           THE COURT:  Just in terms of individual

                    9   claims, what defenses would there have been --

    10:49:58       10           MR. BENNETT:  Well --

                   11           THE COURT:  -- to the -- you mentioned before,

                   12   negligent failure to give notice is enough to sustain a

                   13   cause of action?

                   14           MR. BENNETT:  It is for actual damages, Judge.

    10:50:11       15           THE COURT:  And the 170,000 -- well, none of

                   16   them received notice, right?

                   17           MR. BENNETT:  Well, the defendant does not

                   18   agree that they did not receive notice.  The Court has the

                   19   summary judgment briefing that is before it.

    10:50:28       20       The question as to whether or not the notice that was

                   21   provided complies with the law and whether that -- the

                   22   violation was willful are both certainly hotly contested,

                   23   and ultimately, this settlement is right after summary

                   24   judgment is complete.

    10:50:52       25           THE COURT:  So -- and what's the claims

1    process?  Has any of the claim forms been shipped out to

2    people?

3                MR. DOOLEY:  Your Honor, if I may speak to the

4    claims process, the mechanics of it.

10:51:05  5    We sent out approximately 163,000 claim forms and that

6    was after receiving 163,498 names from the vendor that

7    supplied these reports to CRST.

8    Of that 163,000, 116,000 didn't have addresses, so

9    McGladrey, who was hired to administer the settlement, ran

10:51:29 10    those through Accurint and obtained addresses for most of

11    them and then scrubbed that through the NCOA, the National

12    Change of Address Database.

13    Of that -- of that, there were about 2,400 that didn't

14    come back with addresses.  Those were sent to defense

10:51:43 15    counsel who reviewed the records of CRST and sent some

16    addresses back.

17    Of those, at the end of the day, after scrubbing at

18    all these levels, and plus hiring another researcher, of

19    163,498, of that, only 304 could not be located in terms of

10:52:06 20    finding an address.

21    The notices were mailed.  There were two claim forms.

22    There's a group, we refer to them as the five-year group,

23    because under the FCRA, the statute of limitations is two

24    years from the date of discovery, not to exceed five years,

10:52:19 25    so we have a five-year group, which is the 125, and we have

1    a two-year group, which is the 200, and that goes to one of

2    the defenses that CRST would argue, on an individual basis,

3    that the five-year statute would not apply.

4         Of all the claim forms sent, we received 25,000 claim

10:52:35  5    forms, or approximately 19 percent claims rate.  We did have

6    some undeliverables, some had forwarding addresses, and they

7    were re-sent, and some did not.

8         To answer your initial question, we had 25,000 actual

9    claim forms.  The form itself is one page, it asks for a

10:52:53 10    name, address, e-mail, and essentially, a certification that

11    they actually applied through CRST.

12              THE COURT:  So the actual amount recovered is,

13    what, somewhere in the range instead of $4 million, it's

14    somewhere in the range of under a million, if all those

10:53:14 15    submitted claims are processed and approved?

16              MR. DOOLEY:  Your Honor, the way that it is

17    structured, it is a pro rata distribution.

18         If you assume that everyone was equal, and McGladrey

19    is paid from the common fund under the terms of the

10:53:28 20    settlement, and if the Court were to award the attorney fees

21    that were requested, and you treated everyone equally

22    between 125 and the 200, so if you divide 25,000 by

23    approximately $3 million, it's $107 and some change.

24              THE COURT:  So the -- and maybe I'm confused.

10:53:48 25         So the -- the fewer amount of claims that are made,

1      the larger payment to each of the claimants, up to a maximum

2      of either 125 or 200?

3                      MR. DOOLEY:  Yes, Your Honor.

4                      THE COURT:  So the fact that there's going --

10:54:07  5      there are only 20 percent, roughly, of -- have made claims,

6      are you saying that does not implicate or affect the total

7      payout?

8                      MR. DOOLEY:  It reduces it substantially.

9          There was an assumption I think on all parts, based

10:54:21 10      upon past experience in class action, that the claims rate

11      would not be 19 percent.  Statistically, that's relatively

12      higher than normal with a claims process.  However, all of

13      the money is being spent at this point in time.

14          If there are uncashed checks, there's obviously a cy

10:54:38 15      pres beneficiary that we would like to distribute uncashed

16      checks to.  All of the money is being given to class

17      members.

18                      MR. BENNETT:  The --

19                      THE COURT:  So -- so, in other words, the fact

10:54:51 20      that there's been such a low, a relatively low response, and

21      I -- I've had, you know, class actions, and each one varies

22      to some degree in terms of how much the payments are and

23      how -- what the class involves, but 20 percent is fairly

24      typical, it may be a bit higher than many.

10:55:15 25                      MR. DOOLEY:  Your Honor, in the context of

1    this case as well, we were faced with a relatively transient

2    population of truck drivers, and I think from the data that

3    we received back after scrubbing the addresses from consumer

4    reporting agencies and the change of address database, we

10:55:32  5    achieved what might be expected in this case.

6              MR. BENNETT:  And, Your Honor, to answer your

7    question, I've not negotiated a -- what you're referring to

8    is a circumstance where there's a full reversion and the

9    attorneys appear before the Court and pretend that there's a

10:55:53 10    common fund of a higher amount that doesn't exist.

11         That is not this settlement and I'm not aware of -- I

12    mean, I'm not unaware -- I know that I've never been part of

13    a settlement in which there was a, what I'll call a

14    fictional or imaginary common fund.  This is a certain

10:56:15 15    amount of money.  It is spent.  It relieves the defendant

16    and it is going to the class members.  It's just a matter of

17    how much per class member.

18              THE COURT:  Okay.  So in terms of the cy pres,

19    why would the -- why is the settlement structured such that,

10:56:38 20    as I understood, 75 percent reverts to CRST?

21              MR. DOOLEY:  Your Honor, the way the cy pres

22    structure is set up, if there are uncashed checks, the first

23    $250,000 of uncashed checks would be divided equally into

24    two cy pres beneficiaries selected by plaintiffs and

10:56:55 25    defendants.

1    The way that it's set up after that, is that if there
2    are additional funds above and beyond $250,000, only
3    75 percent would revert to CRST, the remaining 25 percent
4    would go to those same cy pres.

10:57:12  5    But based on the number of claims that we have, the
6    number of claims that have been submitted, all of the money
7    is being spent right now.  This will only be a function of
8    folks who actually get checks and for whatever reason don't
9    cash them or use them.

10:57:27  10    THE COURT:  In terms of the cy pres, who are
11    they?

12    MR. O'TOOLE:  If I may, there are two cy pres
13    beneficiaries, and on behalf of the plaintiff, we have
14    nominated the West Side Catholic Center, Anita Cook, who is
10:57:41  15    the executive director, is here, and Chris Koehler, who is
16    on the board, is also here.

17    THE COURT:  Are you familiar with all the case
18    law on cy pres?

19    MR. O'TOOLE:  I am, Your Honor.

10:57:53  20    And the reason why we identified the West Side
21    Catholic Center is that previously they have also been
22    involved in a cy pres award in a FCRA case.

23    They have a specific program set up to help
24    individuals with ID problems.  One of the -- one of the big
10:58:14  25    problems of those persons who are disadvantaged is that they

1    lack ID, they lack proper identification, or they have some

2    problem with their background that has prohibited them or

3    discouraged them from getting that identification.

4         The West Side Catholic Center, working with 17 other

10:58:32  5    charities throughout the Northern Ohio area, have begun to

6    address that need.  I'm sure that either Chris or --

7                   THE COURT:  Who's the other one?

8                   MR. O'TOOLE:  I'm sorry?

9                   THE COURT:  Who's the other charity?

10:58:44 10                   MR. LUCHT:  Your Honor, Greg Lucht for the

11   defendant, Your Honor.

12        The way it was originally structured were that the two

13   cy pres actually were children's hospitals, but then, in

14   speaking with plaintiffs' counsel, they had identified this

10:58:59 15   other additional or alternative cy pres, which is the

16   identification crisis collaborative project of which

17   opposing counsel had just indicated.

18                   THE COURT:  So I --

19                   MR. LUCHT:  So the other --

10:59:14 20                   THE COURT:  I'm still waiting for a response.

21                   MR. LUCHT:  So if there was -- so the --

22                   THE COURT:  So the West Side Catholic

23   Charities, and who's the other one?

24                   MR. LUCHT:  The other is currently listed as

10:59:24 25   the University of Ohio Children's Hospital.

1          And understanding, Your Honor, in hearing what you had

2    just stated and the case law and the recent cases that have

3    come out regarding the direct ties, we -- and understanding

4    that as of now the money has been spent, in trying to create

10:59:44  5    a --

6                    THE COURT:  What did you just say?

7                    MR. LUCHT:  That the general, the common

8    funds, that the monies will have been spent and that there

9    will not be, other than uncashed checks, money that would go

10:59:55 10    to a cy pres.

11          With that being said, and we're here today indicating

12    that CRST will be willing to indicate that the Iowa Legal

13    Aid nonprofit be a cy pres and be --

14                    THE COURT:  How could they -- I mean, that's

11:00:13 15    kind of fairly ridiculous.  I mean, the cy pres needs to

16    have some connection with the class.  How would the Iowa --

17    the classes, remind me, it's -- you know, it's a nationwide

18    class, but why would they have anything to do with Iowa

19    Legal Aid --

11:00:30 20                    MR. LUCHT:  Well --

21                    THE COURT:  -- the class?

22                    MR. LUCHT:  I'm sorry, Your Honor.

23          The CRST is headquartered in Iowa.  They will have

24    their training and they bring these drivers to --

11:00:43 25                    THE COURT:  I mean, it won't work.  You can't

1    have -- and it's a tenuous connection with West Side

2    Catholic Charities; although, it sounds like they have some

3    program that deals with -- that might deal with or may deal

4    with class members, but Iowa Legal Services or Legal Aid --

5    11:01:09    MR. LUCHT:  It's a connection of protecting

6    consumer rights and those people to, you know, assist them

7    with any possible claims they may have, that would be the

8    connection to the class, Your Honor.

9    THE COURT:  Yeah.  I don't think it's

10   11:01:22   sufficient.  I mean, I don't think that cy pres recipient,

11   and I -- you know, the West Side Catholic Center is probably

12   too broad, unless there was some limitation that it only be

13   spent for a particular program of people who've had trouble

14   with their credit.

15   11:01:45   MR. O'TOOLE:  Your Honor, to that point, I

16   believe that the West Side Catholic Center has actually

17   tailored a program specifically for this.

18   I can tell you and represent to this Court that when

19   they received previous cy pres money, a hundred percent went

20   11:02:01   for the development of the program that I described to the

21   Court.

22   And if the Court would indulge, I'm sure that the

23   executive director could briefly speak to the issue of the

24   Court's concern.

25   11:02:12   THE COURT:  So is there a specific fund or a

1    specific denominated, you know, part of the West Side

2    Catholic Center that -- the idea being you can't just simply

3    give cy pres money to even the most valuable of charities if

4    it is unconnected to the -- to the class which is involved

11:02:40  5    in the litigation.

6         So the class involved in this litigation is people who

7    failed to receive notification of some adverse credit

8    report, so in terms of the thing, if the West Side Catholic

9    Charities was approved, it would have to be limited to

11:03:13  10   some -- something that was specifically dealing with people

11   with these type of either credit errors or credit problems.

12             MR. O'TOOLE:  Agreed, Your Honor.

13        And I think that -- that the program -- Anita -- Your

14   Honor, this is Anita cook.  She's the executive director of

11:03:38  15   the West Side Catholic Center.

16             THE COURT:  Is there a specific --

17             MS. ANITA COOK:  The specific --

18             THE COURT:  -- program?

19             MS. ANITA COOK:  The specific program, what we

11:03:46  20   have done in the past with the cy pres funds we were awarded

21   is they were segregated and we have a separate account for

22   them and those are part of what we call the ID Crisis

23   Collaborative in Cleveland.  We have 24 agencies that work

24   with clients to receive birth certificates and state IDs.

11:04:08  25        These cy pres funds would be targeted towards working

1     with six other agencies on the near west side of Cleveland

2     to work with our clients who are generally homeless or very

3     low income, to help them work with job skills and cleaning

4     up their credit records and to prepare them for employment,

11:04:32  5     because that is the biggest obstacle we have in getting our

6     clients ready for employment, to get jobs, and then get them

7     out of homelessness.

8                 THE COURT:  Okay.  You know, that may -- but

9     it -- the program directed to preparing them, you know, for

11:04:54  10     work is a -- some what of a different, you know,

11     responsibility than the credit problems they may have had.

12     You know, the job skill function probably is not

13     sufficiently related to the class to allow the funds to be

14     used for general job skills.

11:05:18  15                 MS. ANITA COOK:  Well, it wouldn't be just

16     general job skills.  It's also educating them about their

17     credit and the importance of keeping their credit records

18     clean and helping them clean up those credit records so they

19     can obtain employment and move out of homelessness.

11:05:40  20                 THE COURT:  And you can -- can you segregate

21     the money so it's only used for those purposes?

22                 MS. ANITA COOK:  Yes, we can, Your Honor.

23                 THE COURT:  All right.  What are you going to

24     do if it's approved relative to the -- the employer's

11:05:54  25     portion of the cy pres to find some cy pres recipient that

1       would be connected to the class?

2                   MR. LUCHT:  Your Honor, I mean, we would --

3       and we were attempting to try to find a cy pres that had a

4       connection with the -- with identification and consumer

11:06:14  5     rights.

6            We would like to seek and limit directly to what the

7       Court has indicated, knowing that, in addition, that this

8       goes also beyond simple credit reporting, because it does go

9       to identification matters, so we would like to be able to

11:06:34 10     target that specifically.

11           But that's what we would be prepared to do, Your

12      Honor.

13                  THE COURT:  Well, you'll need to, you know,

14      undertake some effort to identify another potential cy pres

11:06:48 15     recipient that is more closely connected to this class.

16                  MR. LUCHT:  Yes, Your Honor.

17                  THE COURT:  Let me go -- there's been a filing

18      requesting fees in this case.

19           How many hours were spent on the case?

11:07:17 20                 MR. DOOLEY:  Your Honor, if I may.  Again,

21      Matt Dooley.

22           In the declarations that we filed in support of the

23      motion, our firm, together with Mr. Bennett, have expended

24      over 1,400 hours, not only up to the point of settlement,

11:07:28 25     but in facilitating the administration process, personally

1    fielding many, to say the least, calls from class members,

2    various inquiries.

3         That includes, as the Court's aware, extensive

4    discovery, motion practice on both the dispositive side and

11:07:44  5    the class certification side, and all the things you must do

6    before filing a complaint to make sure you're bringing the

7    complaint forth on supporting facts.

8                THE COURT:  Are there any other lawsuits

9    pending in any other areas, any other courts?

11:07:59  10                MR. DOOLEY:  With reference to this issue,

11    Your Honor?

12                THE COURT:  With reference to, you know, this

13    same kind of CRST or -- or identifying credit problems.

14                MR. DOOLEY:  Your Honor, we're personally

11:08:12  15    handling other cases against other defendants that relate to

16    similar allegations, so I'm --

17                THE COURT:  So in terms of the 1,400 hours,

18    I'm trying to ensure that that is not -- that that's

19    directly attributable to this case.

11:08:25  20                MR. DOOLEY:  I'll represent to the Court that

21    it is only attributable to this case and not any other

22    litigation.

23                THE COURT:  So even at 1,400 hours, you're

24    seeking a fee award of what?

11:08:35  25                MR. DOOLEY:  Your Honor, we're seeking to

1    carry out the stipulation of settlement, which is a fee not

2    to exceed 30 percent.  We've asked the Court to apply the

3    30 percent contingency, looking at the percentage of the

4    fund analysis that we demonstrated in our motion, as well as

11:08:52  5    what our crosscheck would yield, and the reasonableness of

6    the multiplier, that would bring us to the 30 percent.

7                    THE COURT:  What's the multiplier?

8                    MR. DOOLEY:  I believe it's a roughly 2.4

9    multiplier, which is well below the average.

11:09:06  10                    THE COURT:  Well, each case is some what

11    unique.

12         How difficult was it to prove that they had violated

13    the statute?

14                    MR. DOOLEY:  Your Honor, to get any defendant

11:09:13  15    to settle a case when you're alleging willfulness or

16    recklessness is extremely difficult.

17         The Supreme Court's analysis under *Safeco*, which

18    really set out what it means to be reckless or what it means

19    to be willful, is not an easy burden to prove.  A number of

11:09:29  20    courts have said that FCRA cases in and of themselves are

21    difficult.

22         The FCRA is, quote, a complex statutory scheme, and

23    so, to get intertwined with a defendant like CRST, which is

24    a nationwide trucking company, is an intense endeavor, and

11:09:46  25    to get the discovery to prove enough to cause a defendant

1    like CRST to be willing to settle a case is incredibly

2    difficult.

3                    THE COURT:  How many depositions did you

4    perform?

11:09:55  5                    MR. DOOLEY:  We took four depositions in Cedar

6    Rapids, two depositions here in Cleveland.  The depositions

7    in Cedar Rapids were extensive.  They covered the management

8    from the top down, in terms of the hiring and FCRA

9    compliance.

11:10:07 10                    THE COURT:  So a total of six depositions

11   would be extensive discovery?

12                    MR. DOOLEY:  Your Honor, we were frankly

13   limited, initially at the CMC, with the amount of time we

14   could use.

11:10:18 15        It wasn't just the depositions.  It was the review of

16   the documents that were produced, exchanged, the written

17   discovery, and the back and forth between counsel in

18   litigating all those issues.

19                    THE COURT:  Okay.  Is there any request for

11:10:31 20   expenses?

21                    MR. DOOLEY:  Your Honor, our request for

22   expenses is wrapped into our request for fees, so the

23   contingent award that we're seeking includes attorney fees

24   and costs.

11:10:41 25        Your Honor, if I may add to your points about the

1    reasonableness of all of this, the Court, approximately in

2    maybe July or June, I can't recall, suggested the parties

3    mediate.  One of the Court's suggestions was Judge

4    Robertson, who is with JAMS.

11:10:57  5    The parties did mediate with Judge Robertson in

6    Cleveland, unsuccessfully so initially.  He continued to be

7    involved in this case remotely, trying to facilitate a

8    settlement.  Ultimately, he prepared a mediator's proposal.

9    I believe the number that he proposed compared to what we

11:11:14 10    agreed to later, we agreed to about $450,000 more.

11    So we, as plaintiffs' counsel, and I frankly don't

12    know whether CRST was willing to accept it or not, because

13    that's one of the tactics of mediators, but the mediator's

14    proposal was rejected.

11:11:29 15    The parties continued to negotiate and not until

16    Saturday were we able to finally reach terms that were

17    agreeable to all sides.

18    THE COURT:  Do you have anything you want to

19    say?

11:11:39 20    MR. LUCHT:  Yes, Your Honor.

21    The only thing I would like to add is taking a step

22    back to the beginning with respect to the statutory

23    provisions and the claims against CRST, here, as you've

24    indicated, we've all recognized the claims were -- were

11:11:59 25    served as a willful violation, and in the -- with the

1    statutory framework, this isn't just going to credit report

2    issues.

3         What this was primarily dealing with were consumer

4    reports, one of which is -- primarily is a criminal

11:12:19  5    background report, and the claims of willfulness with

6    respect to the -- the litany of notifications that are

7    required when there's a -- before a report is going to be

8    procured and before -- when adverse action is taken, and in

9    the statutory framework, there are -- there's listings of

11:12:47 10    what notices, such as you have to inform the consumer that

11    they're entitled to a free report.

12         And so, some of the issues in the case weren't

13    necessarily that each and every aspect of the notifications

14    were violated.  It was specific types or subsets of

11:13:11 15    notification was alleged not to be done and that it was done

16    so in a willful manner.

17         And that is where this case has -- you know, has been

18    litigated and with the, you know, eight months or so of

19    litigation, I do echo plaintiffs' sentiments with respect to

11:13:31 20    what was done and the work with the mediator, Your Honor.

21              THE COURT:  Okay.  I'm -- I'm going to approve

22    the settlement.  I'm going to -- with certain changes.

23         I'm going to require the defendant identify proposed

24    cy pres that more closely tracks the -- the class that's

11:13:57 25    been certified.

1          I'm also indicating that the parties will have to give

2     notice to the people that have filed objections or opted out

3     of the Court's tentative approval, but you'll also have to

4     give them specific notice that they will still have time to

11:14:19  5     opt out and retain their claim if -- if they choose to make

6     that decision and afford them, say, 14 days after receiving

7     it to make a decision as to whether they want to go it on

8     their own.

9          In terms of the request for fees, I'm going to cut the

11:14:39 10    fee award.  I do think it's awfully high.  I don't think a

11    multiplier of over two is appropriate in this case.  So I'm

12    going to give the plaintiff a 20 percent contingent fee

13    award.  I think it's consistent with what's happened in

14    similar type cases around the country and I think it's

11:15:05 15    reflective both of the nature of this case and the amount of

16    the recovery.

17          So I otherwise would approve it, subject to your

18    coming up with a different cy pres.

19          And then, finally, I'll just require that the order

11:15:25 20    itself include certain language that the -- the cy pres

21    that's been identified for the Cleveland area specifically

22    restrict its use of any monies they receive to matters that

23    deal with credit histories or credit counseling.

24          So I would ask the parties to prepare an order and

11:15:51 25    circulate it as between yourselves and then forward it to

1    me, and in doing that, perhaps you can identify -- with the

2    motion to approve the order, you can identify the

3    alternative cy pres and perhaps accompany the motion with

4    a -- some information about that cy pres.

11:16:16  5              MR. LUCHT:  Yes, Your Honor.

6              THE COURT:  Okay.  Unless there's something

7    else, we'll adjourn.

8              MR. BENNETT:  Your Honor?

9              THE COURT:  Yes.

11:16:23 10              MR. BENNETT:  This is Len Bennett again.

11        Judge, again, thank you.

12        And to clarify, the 20 percent in fees, the previous

13   fee request had asked that expenses and incentive award all

14   were included by contract under the 30 percent tab.

11:16:41 15        Can we ask that the Court order that we submit,

16   clarify, or allow the 20 percent fee, and then expenses and

17   the incentive award on top of the 20 percent fee?

18              THE COURT:  No.  The 20 percent would include

19   the expenses.

11:16:59 20        I will approve the incentive award, which I believe

21   was 15,000.

22              MR. O'TOOLE:  Correct, Your Honor.

23              MR. DOOLEY:  Correct, Your Honor.

24              THE COURT:  Okay.

11:17:08 25              MR. BENNETT:  Thank you.

1          THE COURT:  And we'll adjourn.

2                          -  -  -

3          (Proceedings concluded at 11:17 a.m.)

4

5

6

7                  C E R T I F I C A T E

8

9       I certify that the foregoing is a correct transcript

10   of the record of proceedings in the above-entitled matter

11   prepared from my stenotype notes.

12

13          /s/ Sarah E. Nageotte              5/29/2013
            SARAH E. NAGEOTTE, RDR, CRR, CBC          DATE
14

15

16

17

18

19

20

21

22

23

24

25